IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

       v.

JOSE CAVAZOS, *et al.*,

    Defendants.

CRIMINAL NO.: WDQ-09-0333

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

MEMORANDUM OPINION

On February 9, 2011, Jose Cavazos and Wade Coats were convicted of conspiracy to distribute and possess with intent to distribute cocaine.  Coats was also convicted of possessing a firearm in furtherance of a drug trafficking crime.  For the following reasons, the defendants' motion for a new trial will be denied.

I.   Background

    A.   The FBI 302s

On December 9, 2009, FBI agents in Dallas, Texas found Alex Noel Mendoza-Cano with nine kilograms of cocaine.  FD-302 at 3, Dec. 11, 2009.  Cano agreed to cooperate with the government, beginning with a series of interviews from December 11, 2009 to April 28, 2010.  FD-302s.  The FBI recorded notes of the interviews on four FBI FD-302 forms ("302s").  The notes revealed that Cano had provided information to the FBI agents

about a drug conspiracy that reached Baltimore, MD and involved James Bostic and Jose Cavazos.  FD-302 at 4, Dec. 11, 2009.

Cano told the FBI that he had been a member of the Gulf Cartel, a Mexican drug cartel, and Los Zetas, the Gulf Cartel's protection unit, since 2005.[1] FD-302 at 1, Dec. 16, 2009.  By 2008 he was second-in-command to Charlie Salazar, *id.* at 15, Jan. 6-14, 2010, and in 2009 he took Salazar's position in the cartel when Salazar was killed,[2] *id.* at 17.  Cano said the Gulf Cartel had given him a gold-plated pistol with the Cartel's name on it when he was promoted.  *Id.* at 18.  Cano said that he had also been involved with the Atlantic Cartel, a Honduran drug cartel.  *Id.* at 5, Jan. 6-14, 2010.

Cano claimed that cocaine came into the United States "hidden inside of secret compartments built into cars and trucks.  The marihuana was smuggled inside of large trucks." FD-302 at 15, Jan. 6-14, 2010.  Cano stated that he made about $120,000 profit for every 30 kilograms of cocaine he sold to Bostic.  FD-302 at 18, Jan. 6-14, 2011.  In 2010, Cano told the

[1] Cano also told the FBI that from Thanksgiving 2004 until late 2006 he worked as a contractor in the United States.  FD-302 at 11, Jan. 6-14 2010.

[2] Cano added that in "approximately 2007 . . . [he] met a Colombian national named . . . 'El Aleman' [who] was employed by a drug trafficker known as 'El Botas' (Spanish for 'The Boots'). . . . Boots was an independent drug dealer who paid the Gulf Cartel a tax to work within their territory." FD-302 at 11, Jan. 6-14 2010.

2

FBI that bricks of cocaine stamped with "LZ" were low grade drugs from the Los Zetas gang. FD-302 at 3, Feb. 9, 2010.

Cano told the FBI that Cavazos had supplied Bostic with cocaine until April 2009, when Cavazos was arrested. Then, Cano asked his boss, who had also worked with Cavazos, "for permission to distribute the drugs to Bostic." FD-302 at 18, Jan. 6-14, 2010. He believed that "Cavazos was stealing money from [the cartel]." FD-302 at 18, Jan. 6-14, 2010.

Cano told the FBI that in April 2009 he went to Dallas to kill Cavazos for stealing from the cartel, but Cavazos had gone to Baltimore. FD-302 at 18, Jan. 6-14, 2010. About then, Cano met with Cavazos's brother, Pedro Cavazos, and beat him so badly that he threw up blood because Pedro was "pretending to be a 'Zeta', and extorting other drug dealers." Id. at 19.

Cano told the FBI that he could not remember how many people he had killed since he was 12 years old, FD-302 at 19, Jan. 6-14, 2010. He recounted numerous killings, including using grenades to kill eight men, and shooting rival gang members. Id. at 10. He once shot a pregnant woman in the face as she watched a soccer game. FD-302 at 8, Jan. 6-14, 2010. Cano "believed that he could lie to other men, but he could not lie to God." FD-302 at 7, Jan. 6-14, 2010.

B.   The Investigation

On April 27, 2009, Officer Brian Shutt and other Task Force Officers were investigating Ronald Brown based on a tip that he was distributing heroin in Baltimore. Def.'s Mem. in Supp. of Mot. to Suppress, Ex. 1 at 7. The officers saw Brown give Wade Coats a bag of what Shutt believed was packaged money. *Id.* Ex. 1 at 9. The officers followed Coats to a hotel, then toward an "open air drug market," where they arrested him and searched his car. *Id.* Ex. 1 at 10. A police dog alerted for the odor of narcotics in the car, and the officers found a police scanner and two fake driver's licenses in the car. *Id.* A pat down and later search incident to Coats's arrest found a .40 caliber handgun and $7,000, $5,000 of which was in his sock. *Id.* Ex. 1 at 10-11.

The officers then secured the hotel room Coats had entered. As they entered the room, Shutt saw Jose Cavazos standing near several heat-sealed wrapped packages in the room. *Id.* Ex. 1 at 11. Cavazos was arrested and given *Miranda* warnings. He told officers that he was "just the money counter, no drugs in the room," but there was "like $200,000" in the room. *Id.* Ex. 1 at 11-12. He also stated that the drugs "are not here yet, I count the money and make sure that it is good." Shutt told another officer to look in the hotel garage for Cavazos's car. The

4

officer found a Dodge Caravan registered to Crystal Cavazos.  A
K-9 alerted to narcotics in the Caravan.  *Id.*

Upon the execution of search warrants for the hotel room,
the Caravan, a cell phone store Coats visited that night, and
Ronald Brown's home, the officers recovered: (1) $274,000 in
heat sealed plastic bags, a heat sealer machine and bags, a
money counter, cell phones, and a tally sheet from Room 943; (2)
an orange suitcase with $337,482 from the Dodge Caravan; (3)
$16,520, paperwork, heat sealer bags, and a gun magazine from
the cell phone store; and (4) 410 grams of cocaine, 238 grams of
heroin, a bag of gel capsules, a gel capper press, scales, a
metal strainer and spoon, and a cell phone from Brown's home.
Govt's Opp'n Defs. Mot. to Suppress 6.

C.   The Trial

Coats, Cavazos, and Brown were indicted for conspiracy to
distribute and possess with intent to distribute heroin,
cocaine, and marijuana, and other charges.  On June 16, 2010,
James Bostic, a co-conspirator, pled guilty to conspiracy to
distribute and possess with intent to distribute marijuana and
cocaine.  ECF No. 75.

At Cavazos and Coats's trial, the government relied on
testimony from Brown and Cano to establish the existence and
scope of the drug conspiracy.  Cano testified that he was a
member of the Gulf Cartel until late 2009, when he was arrested

5

in Texas and cooperated with the United States government. Trial Tr. 8:5-6; 27:20-21, Feb. 2, 2011. He said Cavazos was a member of the Gulf Cartel, and Coats worked for Cavazos but was not a member of the cartel. Tr. 66:18-20.

Cano testified that he was "a drug dealer" who had been involved with two violent drug cartels: the Gulf Cartel and the Atlantic Cartel. Tr. 33:14-16; 36:22-24. He admitted that murder was a necessary part of being in a drug cartel, and he had been involved in a gunfight with police. Tr. 33:22-25; 34:15-17. Cano admitted that he had lied before, Tr. 48:7-9, and expected to receive a lenient sentence because of his cooperation, Tr. 27:20-21.

Cano testified that in 2004 he started working "as a connection" for his boss, Charlie Salazar, and the Gulf Cartel. Tr. 37:3-9. In 2006 he heard that Cavazos had lost 70 kilograms of Cartel drugs in Dallas. Tr. 15:25; 17:5-22; 18:1-9. He also testified that he worked for the Gulf Cartel from 2006 to 2009, before his arrest, Tr. 8:5-6, and in 2009 he investigated Cavazos's arrest to confirm that the cartel's drug money had been lost, Tr. 3:4-5; 8:10-14. He said that although he had heard about the 2006 loss of drugs, he had not investigated it as he had the 2009 loss. Tr. 17:4-8. Cano believed Cavazos was taking drugs from the cartel. Tr. 17:12-23; 18:1-7.

Cano testified that the cartel brought marijuana into the United States through Mexico in refrigerated truck trailers, Tr. 6:7-8, but smuggled drugs "in various ways. Sometimes they would come in trailers. Others would come in a car," *id.* at 6:1-3. He also stated that some of the cars had secret compartments for drugs. *Id.* at 5:16-18. To smuggle the drug proceeds back into Mexico, "sometimes we go across lakes, on jet skis, on boats." Tr. 22:9; 22:16-25. Cano said that the Gulf Cartel marked kilos of cocaine with Mickey Mouse's face. Tr. 18:4-5. Cano testified that in 2009, Los Zetas, the armed contingent of the Gulf Cartel, became an independent cartel. Tr. 29:7-8.

Cano testified that he moved drugs from Houston, Texas up the east coast. Tr. 4:14-16. He noted that he had not exclusively controlled the cartel's drug distribution centers in which he had dealt drugs. *See* Tr. at 40:6-12 ("Not all the customers will always be mine."). Cavazos supplied drugs to Coats and Bostic in Baltimore until Cavazos was arrested. Tr. 13:8-16.

Cano testified that the cartel offered to provide him with an attorney when he was arrested, but he had refused. Tr. 26:6-7. After that, he got a public defender and agreed to cooperate with the government. Tr. 27:20-21. In addition to testifying, Cano recorded a conversation with Bostic in which they discussed

the drug conspiracy, and, working for the FBI, Cano arranged for
a shipment of drugs to be sent to Bostic, and the FBI arrested
him as he collected the drugs.  Tr. 37:8-22; 38:1-7.

Cano testified that he "[had] not [been] in the business of
killing people," before his arrest, tr. 36:17-18, that he had no
guns when he was arrested in Dallas, tr. 35:22-23, and he had
not shot at police officers in Mexico, though he was present for
a shootout, tr. 35:16-18.  He testified that when he was
arrested he "had no firearms on [his person]."  Tr. 35:22-23.

At trial, Cano testified that he would not lie under oath;
he also said that he "[didn't] care about other people," that he
was "helping [him]self" by testifying, that he saw Cavazos as a
"distribution line," not a person, and that he didn't know
"Bostic.  Why should [he] care about him?" Tr. 54:12-20.  Cano
admitted that he had lied to others: he had "deceived" Jesus
Lopez by offering him a deal with James Bostic, but "once we had
the connections, we cut him out."  *Id.* at 48:7-9.

On February 9, 2011, after a five-day trial, the jury
convicted Cavazos and Coats of conspiracy to distribute and
possess with intent to distribute five or more kilograms of
cocaine, and Coats of possession of a firearm in furtherance of
a drug trafficking crime.  ECF Nos. 141, 143.

On April 25, 2011, the government sent counsel for Coats
and Cavazos the 302s.  The Maryland prosecutors had not become

8

aware of the 302s until after trial.  When they received the notes, the defendants moved for a new trial.[3]  ECF No. 151.

## II.  Analysis

The defendants contend that the government's failure to provide the FBI interview notes violated *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500 (2006).  J. Mot. for New Trial & Req. for Hr'g 3.

### A.  Jencks Act

The Jencks Act requires the government to give the defendant any statement of a witness in the government's possession related to the witness's testimony.  18 U.S.C. § 3500(b).  A statement includes "a written statement made by [the] witness and signed or otherwise adopted or approved by him."  *Id.* § 3500(e)(1).  Notes taken by government agents interviewing the witness are a witness's

> statement . . . if the witness has reviewed them in their entirety—either by reading them himself or by having them read back to him—and formally and unambiguously approved them . . . as an accurate record of what he said during the interview.

*United States v. Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994). That a government agent discussed the "general substance" of the

---

[3] The defendants requested a hearing on the motion, and asked that the 302s be made part of the record.  Because the issues have been thoroughly briefed, no hearing is necessary.  The 302s will be made part of the record.

witness's statement does not show that the witness adopted or approved the notes. *Id.*

The defendants do not contend that Cano adopted the 302s. The notes are in English, and the interviews were conducted in Spanish because Cano is not fluent in English. FD-302 at 1, Dec. 16, 2009. The defendants do not contend that anyone read the notes to Cano, or that he signed them. *See id.* at 1-4. As Cano did not adopt the notes as his statement, they are not Jencks material.

B.   *Brady* & *Giglio*

To obtain a new trial based on a *Brady* violation, the defendants must show that evidence was: (1) favorable to the defendants; (2) material; and (3) suppressed by the government.[4] *United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001); *see also Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). The parties agree that the evidence is favorable and was suppressed. Govt.'s Mem. in Opp. At 4-5; Defs.' Resp. at 1. Its materiality is disputed.

Impeachment evidence is material if "there is a reasonable probability that [its] disclosure would have produced a different [trial] outcome." *Stokes*, 261 F.3d at 502; *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). Such a

---

[4] Whether the government failed to disclose the evidence in good faith is irrelevant. *Giglio*, 405 U.S. at 145.

probability is established when "the government's evidentiary
suppression undermines confidence in the outcome of the trial."[5]
*Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003).
Materiality "must be considered 'collectively, not item by
item.'"  *Id.* (*citing Kyles v. Whitley*, 514 U.S. 419, 436
(1995)).

Impeachment evidence is not material if the witness's
testimony was corroborated by other evidence at trial.  *Muhammad
v. Kelly*, 575 F.3d 359, 369 (2009); *see also United States v.
Cole*, 293 F.3d 153, 163 (4th Cir. 2002).  It is not material if
it "would have provided only cumulative impeachment" of the
witness's testimony because the witness was impeached on the
subject contained in the suppressed evidence.  *Ellis*, 121 F.3d
at 917 (evidence of "additional lies" by witness who was
extensively impeached at trial with past lies, criminal history,
and plea agreement, was cumulative and immaterial); *United
States v. Hoyte*, 51 F.3d 1239, 1243 (4th Cir. 1994).
Impeachment evidence is more likely to be material when it is
about a critical witness, rather than a less significant one.[6]

---

[5] The suppressed evidence must "put the whole case in such a
different light as to undermine [the court's] confidence in the
verdict."  *United States v. Ellis*, 121 F.3d 908, 918 (4th Cir.
1997).

[6] *Banks v. Dretke*, 540 U.S. 668, 701-02 (2004) (that critical
witness—who was impeached on other grounds at trial—was an
informant was material because informants pose "serious

The defendants contend that six areas of Cano's 302s contradict his testimony and undermine confidence in the verdict: (1) his willingness to lie, (2) past violence, (3) his relationship with Coats, Cavazos, and Bostic, (4) when he became involved with Los Zetas and the Gulf Cartel, (5) his bias against Cavazos, and (6) drug transaction logistics.[7]

### 1.   Cano's Willingness to Lie

The defendants argue that Cano's interview statement that he "believed that he could lie to other men, but he could not lie to God," FD-302 at 7, Jan. 6-14, 2010, contradicts his trial testimony that he would not lie under oath, Trial Tr. 55:7-14, Feb. 2, 2011. Defs.' Am. Mem. in Supp. at 6.

At trial, Cano insisted that he would not lie under oath; he also said that he "[didn't] care about other people," that he was "helping [him]self," that he saw Cavazos as a "distribution line," not a person, and that he didn't know "Bostic. Why

---

questions of credibility;" new trial granted). Evidence that a critical witness contradicted his trial statements, is a regular informant, and expected favorable government treatment in exchange for testifying may be material. *Monroe*, 323 F.3d at 312-15 (evidence was material, and new trial was proper, when Government also withheld five other pieces of evidence, Government's case was "tenuous," and defense was strong).

[7] The defendants argue that they are entitled to a new trial because Cano's testimony "was essential to the Government's allegations [of drug quantities] that pertain to the proper calculation of the sentencing guidelines." Defs.' Am. Mem. in Supp. at 5. The grant of a new trial depends on confidence in the *jury's verdict*, not the sentence. *See Ellis*, 121 F.3d at 918.

should [he] care about him?" Tr. 54:12-20. Cano admitted that
he *had* lied to others when he said he had "deceived" Jesus Lopez
by telling him he would earn money on a deal with James Bostic,
but "once we had the connections, we cut him out." *Id.* at 48:7-
9. Cano also noted that after he was arrested he "turned Jimmy
[Bostic] in" to government and deceived Bostic to help himself.
*Id.* at 28:1-7; *see also Banks*, 540 U.S. 701-02. Cano also
admitted that he expected to receive a benefit from testifying.
Tr. 27:20-21. Cano's statement that he could lie to others
would have been cumulative on the issue of his willingness to
lie. *See Ellis*, 121 F.3d at 917.

### 2. Cano's Prior Violence

At trial, Cano testified that he "[had] not [been] in the
business of killing people," Tr. 36:17-18, that he had no guns
when he was arrested in Dallas, Tr. 35:22-23, and he had not
shot at police officers in Mexico, Tr. 35:16-18. Cano told the
FBI that he could not remember how many people he had killed
since he was 12 years old, FD-302 at 19, Jan. 6-14, 2010. He
recounted numerous killings, including using grenades to kill
eight men, and shooting rival gang members.[8] *Id.* at 10. He also
said the Gulf Cartel had given him a gold-plated pistol with the

---

[8] Cano also said he once shot a pregnant woman in the face as she
watched a soccer game. FD-302 at 8, Jan. 6-14, 2010. Evidence
that Cano shot a pregnant woman in the face may arguably have
been excludable under Fed. R. Evid. 403 as more prejudicial than
probative.

13

Cartel's name on it when he was promoted. *Id.* at 18.  The
defendants argue that Cano's statements to the FBI reveal that
he lied at trial.

Cano did not deny liking guns, as the defendants contend.
Def.'s Am. Mem. in Supp. at 6.  He testified that when he was
arrested he "had no firearms on [his person]."  Tr. 35:22-23.
His statement that the Gulf Cartel gave him a decorated gun when
he rose in the organization, FD-302 at 18, Jan. 6-14, 2010, does
not contradict his trial testimony.  Thus, it is not material.
*See Ellis*, 121 F.3d at 918.

Evidence of Cano's past violence would have enabled the
defendants to counter his suggestion that he was not violent.
However, Cano's testimony made clear that he was "a drug
dealer," Tr. 36:22, who was intimately involved with two violent
drug cartels, Tr. 33:14-16; 36:24, that murder was a necessary
part of being in a drug cartel, Tr. 33:22-25, and he had been
involved in a gunfight with police, Tr. 34:15-17.

3.   Cano's Relationship to Coats, Cavazos, and Bostic

The defendants argue that Cano's statement that he had
"distributed cocaine to Baltimore for the cartel . . . directly
contradicts his claims that Cavazos distributed drugs to
Baltimore for the cartel."  Defs.' Am. Mem. in Supp. at 6.  Cano
testified that he had not exclusively controlled the cartel's

14

drug distribution centers in which he had dealt drugs. *See* Tr. at 40:6-12 ("Not all the customers will always be mine.").

The defendants also argue that Cano's trial testimony that Cavazos supplied drugs to Coats and Bostic in Baltimore until Cavazos was arrested, Tr. 13:8-16, contradicts Cano's 302 statements that "[Cano's] drug customer in Baltimore is a man named 'Jimmy,' not Wade, not Wade and Jimmy but simply 'Jimmy.'" Defs.' Am. Mem. in Supp. at 7 (*citing* FD-302 at 18, Jan. 6-14, 2010). Cano told the FBI that Cavazos had supplied James Bostic with cocaine until April 2009, when Cavazos was arrested. Then, Cano asked his boss, who had also worked with Cavazos, "for permission to distribute the drugs to Bostic." FD-302 at 18, Jan. 6-14, 2010. The statements reflect drug distribution personnel changes over time, and are not inconsistent. Thus, the statements would not have impeached Cano.[9]

4.   When Cano Became a Member of the Gulf Cartel

The defendants contend that Cano's statements to the FBI that he started to work for the Gulf Cartel in 2005 contradict his trial testimony, and make it "impossible." Defs.' Resp. at 3.

---

[9] The defendants contend that Cano never told the FBI that Cavazos owed him money, although at trial he testified that Cavazos had lost cartel funds. Defs.' Am. Mem. in Supp. at 7. In fact, he told the FBI that "Cavazos was stealing money from [the cartel]." FD-302 at 18, Jan. 6-14, 2010.

Cano told the FBI that from Thanksgiving 2004 until late 2006 he worked as a contractor in the United States. FD-302 at 11, Jan. 6-14 2010. He told the FBI that he had been a member of the Gulf Cartel and Los Zetas since 2005,[10] id. at 1, Dec. 16, 2009, by 2008 he was second-in-command to Charlie Salazar, id. at 15, Jan. 6-14, 2010, and in 2009 he took Salazar's position in the cartel when Salazar was killed, id. at 17. At trial, Cano testified that in 2004 he started working "as a connection" for Charlie Salazar and the Gulf Cartel. Tr. 37:3-9. In 2006 he heard that Cavazos had lost 70 kilograms of drugs in Dallas.[11] Tr. 15:25; 17:5-22; 18:1-9. He testified that he worked for the Gulf Cartel from 2006 to 2009, before his arrest, Tr. 8:5-6, and in 2009 he investigated Cavazos's arrest to confirm that the drug money had been lost, Tr. 3:4-5; 8:10-14.

---

[10] The defendants assert that Cano told the FBI he had not joined the Gulf Cartel until 2007. Defs.' Am. Mem. in Supp. at 8. They rely on Cano's statement that in "approximately 2007 . . . [he] met a Colombian national named . . . 'El Aleman' [who] was employed by a drug trafficker known as 'El Botas' (Spanish for 'The Boots'). . . . Boots was an independent drug dealer who paid the Gulf Cartel a tax to work within their territory." FD-302 at 11, Jan. 6-14 2010 (emphasis added). In that passage, Cano did not state that he began working for the cartel in 2007.

[11] The defendants contend that Cano testified at trial that he had "investigated" this loss. Defs.' Am. Mem. in Supp. at 7. The only investigation Cano testified to at trial was his investigation of the 2009 loss. See Tr. 17:4-8 ("Q: Mr. Mendoza-Cano, did you ever conduct any other investigations [than in 2009] with regard to the loss of drugs by Mr. Cavazos? A: No."). Thus, the 302s do not conflict with the testimony.

16

The defendants contend that the 302s show that Cano could not have known as much about Cavazos and Coats as he implied at trial, and that he might not have been a member of the cartel at all. Defs.' Resp. at 3. The discrepancies do not support this contention. Based on Cano's statements to the FBI, he was in the United States by the end of 2004, and his contracting work overlapped with his early work for the cartel. Any differences between his trial testimony and the 302s are minor. The defendants have also argued that the 302s undermine Cano's claim that he knew of Cavazos as early as 2006. Cano has consistently stated that he started working for the Gulf Cartel in 2005. The 302s do not render his testimony "impossible."

　　　　　5.　Cano's Bias Against Cavazos

The defendants argue that the 302s reveal an "animosity towards Cavazos [that] . . . goes directly to the bias of the witness and his motive to fabricate testimony on the stand." Defs.' Am. Mem. in Supp. at 8. Cano told the FBI that in April 2009 he went to Dallas to kill Cavazos for stealing from the cartel, but Cavazos had gone to Baltimore. FD-302 at 18, Jan. 6-14, 2010. About then, Cano met with Cavazos's brother, Pedro Cavazos, and beat him so badly that he threw up blood because Pedro was "pretending to be a 'Zeta', and extorting other drug dealers." *Id*. at 19.

17

At trial, Cano testified that he had believed Cavazos was taking drugs from the cartel, Tr. 17:12-23; 18:1-7. Cano also admitted that he "[doesn't] care about other people," and that he "[didn't] see Mr. Cavazos," only "a distribution line." Tr. 54:12-18. As noted above, Cano admitted that he had deceived others, and that he had been an informant to help himself. Tr. 27:10-22. Cano's testimony at trial indicated his little regard for--possible bias against--Cavazos; that testimony also indicated that Cano had reasons to lie. Tr. 17:12-23; 18:1-7; 54:12-18. Though his plan to kill Cavazos is an example of Cano's bias against him, that bias was explored at trial.

     6.   Miscellaneous Inconsistencies

The defendants have identified four inconsistencies between Cano's testimony and the FBI notes, with which they could have impeached Cano at trial. Defs.' Am. Mem. in Supp. at 8. None of the statements is inconsistent with his trial testimony.

The defendants argue that the 302s "make clear that [Cano's] rejection of the cartel lawyer happened . . . prior to Cano setting up narcotics and money transactions between the cartel and James Bostic at the FBI's request." *Id.* They contend that the cartel would not have done business with Cano after he rejected their lawyer, and the 302s would have enabled them to impeach Cano on his claim that he was offered, and had rejected, a cartel lawyer. *Id.* That Cano claimed he set up a

18

drug deal with Bostic after rejecting a cartel lawyer was clear
at trial; the 302s do not provide new information about it.[12]  At
trial, Cano testified that when he got a public defender, he
agreed to cooperate with the government, and "with regard to
Baltimore," he helped with a sting operation on Bostic.  Tr.
37:8-22; 38:1-7.  The defendants could have impeached Cano on
why the cartel would continue to work with him after he rejected
their lawyer at trial without the 302s.

The defendants also argue that Cano contradicted himself
about how drugs are smuggled into the United States, the price
of kilograms of cocaine sold to Bostic, and how the cartel marks
its drugs.  Cano's statements are consistent.

At trial, Cano testified that the cartel had brought
marijuana into the United States in refrigerated truck trailers,
Tr. 6:7-8, but generally smuggled drugs "in various ways.
Sometimes they would come in trailers.  Others would come in a
car," id. at 6:1-3.[13]  He also stated that some of the cars had
secret compartments for drugs.  Id. at 5:16-18.  The 302s
support these statements.  Cano told the FBI that cocaine came
into the United States "hidden inside of secret compartments

---

[12] Defendants are unable to identify any passage in the 302s that
supports their argument.  See Defs.' Am. Mem. in Supp. at 8.
[13] The defendants also rely on Cano's statement "sometimes we go
across lakes, on jet skis, on boats."  Tr. 22:9.  Cano is
referring to smuggling money into Mexico, not bringing drugs
into the United States.  Tr. 21:16-25.

built into cars and trucks.  The marihuana was smuggled inside
of large trucks."  FD-302 at 15, Jan. 6-14, 2010.  Cano gave the
FBI more information about how the trucks crossed the border
than he gave at trial, but that information did not contradict
his trial testimony.

In the 302s, Cano did not mention his price for the cocaine
sold to Bostic; he merely stated that he made about $120,000
profit for every 30 kilograms of cocaine he sold to Bostic.  FD-
302 at 18, Jan. 6-14, 2011.  The defendants rely on two
inconsistent statements within Cano's testimony, Defs.' Am. Mem.
at 8, but fail to show how the 302s relate to the testimony.
The defendants note that at trial, Cano said that the Gulf
Cartel marked kilos of cocaine with Mickey Mouse's face.  Tr.
18:4-5.  In 2010, Cano told the FBI that bricks of cocaine
stamped with "LZ" were low grade drugs from Los Zetas.  FD-302
at 3, Feb. 9, 2010.  Cano testified that in 2009, Los Zetas, the
armed contingent of the Gulf Cartel, became an independent
cartel.  Tr. 29:7-8.  That two cartels used different trademarks
does not impeach his trial testimony.

7.   Collective Impact of the Withheld Evidence

The 302s are largely consistent with Cano's trial
testimony.  Most of those that are inconsistent present
impeachment material that would have been cumulative to the

20

impeachment accomplished at trial.[14]   Only the detailed evidence
of Cano's past violence--including his intent to murder Cavazos-
-conflicts with Cano's trial testimony.

Although these statements might have provided additional
impeachment of Cano, they do not "undermine[] confidence in the
outcome of the trial."  *Monroe*, 323 F.3d at 302.   The jury was
aware that Cano had lied before and was testifying for a
benefit.   That awareness raised issues of Cano's credibility for
the jurors.  *See Banks*, 540 U.S. at 701-02.   Cano's belief that
Cavazos was stealing from the cartel, and his attempt to collect
the money Cavazos lost by "pressur[ing]" Cavazos's associates
for the lost funds, Tr. 47:5-6, revealed a possible bias against
Cavazos.   The suppressed evidence does not require a new trial.

III. Conclusion

For the reasons stated above, the defendants' motion for a
new trial will be denied.

_____9/29/11_____

Date

_____
William D. Quarles, Jr.
United States District Judge

---

[14] For example, Cano's willingness to lie.